**Nos. 5:26-cv-02170-CH and 5:26-cv-02211-CH**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

**In re WHITEHALL TRUST,**
***Debtor.***

**Whitehall Trust,**
***Appellant*.**

---

**In re SAUCON TRUST,**
***Debtor.***

**Saucon Trust,**
***Appellant*.**

---

# BRIEF OF APPELLEE LEHIGH VALLEY 1, LLC

*Appeal from the Order of the United States Bankruptcy Court for the Eastern District of Pennsylvania Granting Lender's Motion to Dismiss the Trust Debtors' Bankruptcy Cases, No. 25-15241 (PMM)*

---

Matthew A. Hamermesh
Sara E. Smith
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
1735 Market Street, 26th Floor
Philadelphia, PA 19103
(215) 568-6200
mhamermesh@hangley.com
ssmith@hangley.com

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road
Building 3, Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

*Counsel for Appellee Secured Creditor Lehigh Valley 1, LLC*

# TABLE OF CONTENTS


I. Introduction ........ 1

II. Jurisdiction ........ 5

III. Issues Presented ........ 6

IV. Standard of Review ........ 7

V. Statement of the Case ........ 10

- A. The Loans and Defaults ........ 10
- B. The Foreclosure Actions ........ 12
- C. The Formation of Whitehall Trust ........ 13
- D. The Formation of Saucon Trust ........ 14
- E. The Lease Agreements ........ 16
- F. The Dismissal of the Trusts' Bankruptcy Cases ........ 17
- G. The Conflict of Interest Between the Trusts and the Manor Debtors ........ 18

VI. Summary of the Argument ........ 20

VII. Argument ........ 21

- A. Legal Standard ........ 21
- B. What is a Business Trust? ........ 22
  - 1. Courts have applied various tests for whether a trust is a business trust ........ 24
  - 2. The test adopted by the Bankruptcy Court ........ 29
- C. The Test the Trusts Propose Is Incomplete, and Even So, the Trusts do Not Satisfy This Standard ........ 30
  - 1. The Trusts are not business trusts because they were not created for a business purpose ........ 31

2. The Trusts are not business trusts because they were not maintained to conduct business ........ 39

3. The Trusts' business-purpose-only test is incomplete ........ 43

D. The Trusts Fail Under Any Definition of Business Trust ........ 46

1. The factors considered by the Bankruptcy Court ........ 46

2. The Trusts fail to satisfy the other characteristics of business trusts courts have recognized ........ 53

VIII. Conclusion ........ 59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Allegiance Coal USA Ltd.*,
670 B.R. 1 (D. Del. 2025) .......... 5

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985) .......... 9

*In re Blanche Zwerdling Revocable Living Trust*,
531 B.R. 537 (Bankr. D.N.J. 2015) .......... 28, 29, 40

*In re Boy Scouts of America*,
137 F.4th 126 (3d Cir. 2025) .......... 7

*In re Catholic School Employees Pension Trust*,
584 B.R. 82 (Bankr. D.P.R. 2018), *aff'd sub nom. Catholic School Employees Pension Trust*, 599 B.R. 634 (B.A.P. 1st Cir. 2019) .......... 7, 22, 40

*In re Dille Family Trust*,
598 B.R. 179 (Bankr. W.D. Pa. 2019) .......... *passim*

*In re Eagle Trust*,
Civ. A. No. 98–2531, 97–23298, 1998 WL 635845 (E.D. Pa. Sept. 16, 1998) .......... 23, 28, 40, 51

*In re EHT US1, Inc.*,
630 B.R. 410 (Bankr. D. Del. 2021) .......... 21

*GBForefront, L.P. v. Forefront Management Group, LLC*,
888 F.3d 29 (3d Cir. 2018) .......... *passim*

*In re Jin Suk Kim Trust*,
464 B.R. 697 (Bankr. D. Md. 2011) .......... 42

*In re John Q. Hammons Fall 2006, LLC*,
573 B.R. 881 (Bankr. D. Kan. 2017) .......... 42, 52

*In re Joobeen*,
385 B.R. 599 (E.D. Pa. 2008) .......... *passim*

*In re Kenneth Allen Knight Trust*,
303 F.3d 671 (6th Cir. 2002) .......................................................*passim*

*Little Four Oil & Gas Co. v. Lewellyn*,
35 F.2d 149 (3d Cir. 1929) ....................................................... 23, 24, 25

*In re Madera*,
586 F.3d 228 (3d Cir. 2009)..........................................................48

*Morrissey v. Commissioner of Internal Revenue*,
296 U.S. 344 (1935) ........................................................ 23, 25, 44, 52

*North Hills Village LLC v. LNR Partners, LLC*,
479 F. Supp. 3d 189 (W.D. Pa. 2020) ............................................*passim*

*In re Quadruple D Trust*,
639 B.R. 204 (Bankr. D. Colo. 2022)....................................... 33, 34, 36

*RBx Capital, LP v. Xorax Family Trust*,
Civ. No. 21-3774, 2023 WL 3324682 (E.D. Pa. May 8, 2023).......... 26, 56

*In re Rubin Family Irrevocable Stock Trust*,
No. 13–72193–dte, 2013 WL 6155606 (Bankr. E.D.N.Y. Nov. 21, 2013) .....................................................................................41

*In re Secured Equipment Trust of Eastern Air Lines, Inc.*,
38 F.3d 86 (2d Cir. 1994) ...........................................................*passim*

*In re Sung Soo Rim Irrevocable Intervivos Trust*,
177 B.R. 673 (Bankr. C.D. Cal. 1995) ..................................................33

*In re Thomas*,
177 F.4th 493 (3d Cir. 2026)............................................................. 7

*In re Tiel Trust I FBO Paula T. Douglass*,
656 B.R. 810 (Bankr. D. Colo. 2024)............................................*passim*

*In re Tribune Co.*,
972 F.3d 228 (3d Cir. 2020)...............................................................8

*In re Two Rivers Irrevocable Trust*,
653 B.R. 284 (Bankr. M.D. Ga. 2023) ........................................... 33, 52

*In re Von Kiel*,
486 B.R. 327 (E.D. Pa. 2013) .......... 48

*U.S. Bank National Association ex rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC*,
583 U.S. 387 (2018) .......... 8

**Statutes**

15 Pa. C.S. § 9501 .......... 47, 49, 51

15 Pa. C.S. § 9503 .......... 47

11 U.S.C. § 101 .......... *passim*

11 U.S.C. § 102 .......... 44

11 U.S.C. § 109 .......... *passim*

28 U.S.C. § 158 .......... 5

72 Pa. Stat. § 8101-C .......... 45, 49

# I. INTRODUCTION

The United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court") dismissed the bankruptcy cases of Whitehall Trust and Saucon Trust (together, the "Trusts") because the Trusts are not business trusts and are thus ineligible to be debtors under the Bankruptcy Code. The Bankruptcy Court found that the Trusts lack the most important elements of a business trust as the Trusts were not created and maintained for business purposes, they failed to satisfy Pennsylvania's business-trust requirements, their beneficial interests are not transferable, the Trusts do not have a perpetual existence, and the Trusts were not formed by a group of investors. The Bankruptcy Court's conclusion—which rests on well-supported factual findings—is overwhelmingly supported by the record.

But the Bankruptcy Court's decision is not just free of clear error—the relevant standard of review—the decision is plainly correct. A quick review of the actual documents that establish the Trusts makes this abundantly clear. The documents reflect that the Trusts are obviously part of estate planning and were not established to operate a business. First, Mr. Atiyeh, the creator and settlor of the Trusts, structured them as living or family trusts. The Trust agreements include both spendthrift clauses and intra-family succession plans. Mr. Atiyeh described the Saucon Trust as a "LIVING

TRUST" in the deed granting it property. And Mr. Atiyeh then maintained in litigation for years that they were **not** business trusts – until that position no longer benefitted him. But Atiyeh's longstanding litigation position and the documents themselves expose the lie in his current position that the Trusts are business trusts.

Moreover, the activities of the Trusts are not those of operating businesses. They each own a single real property, lease the property to an affiliated operating company, and used the rent payments to make mortgage payments. The operating companies—not the Trusts—take care of maintenance, taxes, and insurance. Nothing about the Trusts suggests they are business trusts or any other kind of business entity.

The Trusts nonetheless argue that the Bankruptcy Court's findings were wrong, such as the Court's findings of fact that the Trusts did not carry out business or maintain a business purpose. But the Trusts must do more than convince this Court that it would have reached a different conclusion on this record. The Trusts must show that the Bankruptcy Court committed a clear error, *i.e.*, that this Court, on the entire record, is left with the definite and firm conviction that a mistake has been committed. The Trusts have failed to satisfy that burden here.

This is particularly so with respect to the Trusts' primary purpose. The record shows—and the Bankruptcy Court found—that Mr. Atiyeh did not create the Trusts primarily to conduct business. Rather, Atiyeh intended them to hold and preserve real property and ensure that the properties passed to his descendants. Mr. Atiyeh held the Trusts separate from operating assets to ensure that they would not be subject to claims arising from those operations. The Trusts' attempts to dispute this inescapable conclusion fail.

The Trusts also argue that the Bankruptcy Court erred in considering other characteristics of a business trust beyond just the Trusts' primary purpose. They do not dispute the Bankruptcy Court's findings as to almost all of the other factors. Instead, the Trusts assert generally that although these factors may be relevant, they should not be given more weight than the Trusts' primary purpose. However, the Trusts fail to show that the Bankruptcy Court erred in considering these factors. Nor is any remand necessary even if the Bankruptcy Court gave these factors undue weight, because its finding that that the Trusts were not created and maintained with a business purpose was not clearly erroneous. The record supports the Court's conclusion because it shows that Atiyeh created the Trusts as living trusts intended to protect real estate, insulate the properties from liability,

and facilitate his estate planning (as further evidenced by the Spendthrift Clauses, the intra-family distribution of the res, and the Trusts' eventual termination and distribution of the res to Atiyeh's descendants, all as set forth in the Trust Agreements).

It is the Trusts' burden to demonstrate that the Bankruptcy Court committed clear error in finding that the Trusts are not business trusts. The Trusts have failed to meet that burden. This Court should affirm the Bankruptcy Court's finding that the Trusts are not business trusts and consequent dismissal of the Trusts' bankruptcy cases.

## II. JURISDICTION

A district court has "jurisdiction to hear appeals … from final judgments, orders, and decrees" of bankruptcy courts. 28 U.S.C. § 158(a)(1) (internal footnote omitted). "A bankruptcy court's dismissal of a Chapter 11 case is a final order." *In re Allegiance Coal USA Ltd.*, 670 B.R. 1, 11 (D. Del. 2025) (citation omitted).

On March 19, 2026, the Bankruptcy Court entered an order dismissing the Trusts' Chapter 11 bankruptcy cases, finding that the Trusts are not business trusts and thus not eligible to be debtors under the Bankruptcy Code. The Bankruptcy Court's dismissal of the Trusts' bankruptcy cases is a final order over which this Court has jurisdiction.

## III. ISSUES PRESENTED

1. Where the Bankruptcy Court found that the Trusts are not business trusts because (a) Mr. Atiyeh did not create and maintain the Trusts to conduct business, but instead formed them to insulate the real estate ownership from operational liability and to serve as a means of bequeathing part of his residuary to his descendants, (b) the Trusts fail to satisfy the requirements for a business trust under Pennsylvania law, (c) the beneficial interests in the Trusts are not transferable due to the presence of spendthrift clauses in the respective trust instruments, (d) the Trusts are not meant to exist in perpetuity because the trust instruments provide for estate succession and intra-family distribution of the res, and (e) Mr. Atiyeh alone settled the Trusts, not a group of investors, should this District Court affirm the Bankruptcy Court's finding and its dismissal of the Trusts' bankruptcy cases?

*Suggested Answer: Yes.*

## IV. STANDARD OF REVIEW

District Courts, on appeal from an order of the Bankruptcy Court, must "review the Bankruptcy Court's factual findings for clear error and conduct de novo review of legal conclusions." *In re Thomas*, 177 F.4th 493, 501 (3d Cir. 2026) (citation omitted); *see also In re Boy Scouts of Am.*, 137 F.4th 126, 147 (3d Cir. 2025).

Whether a trust was "created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors" such that the trust is a business trust is a "fact-specific" determination. *In re Kenneth Allen Knight Tr.*, 303 F.3d 671, 680 (6th Cir. 2002) (citation omitted). "Regardless of whether the primary purpose test, or some other test, is applied to determine whether an entity is eligible to be a debtor under § 109 of the Bankruptcy Code, [t]he one overriding principle that emerges from the cases is that the determination of whether a trust is a business trust is fact-specific and focuses on the purpose and operations of the trust." *Cath. Sch. Emps. Pension Tr.*, 599 B.R. 634, 662 (B.A.P. 1st Cir. 2019) (quotations omitted). A Bankruptcy Court's finding that a trust is not a business trust thus rests on findings of fact that are reviewed for clear error. *See Boy Scouts*, 137 F.4th at 147.

The courts of appeals that have addressed business-trust eligibility apply the clear-error standard of review to the bankruptcy court's factual findings. *See In re Secured Equip. Tr. of E. Air Lines, Inc.*, 38 F.3d 86, 89 (2d Cir. 1994) (reviewing "the court's definition of 'business trust' *de novo*, and its factual findings for clear error"); *Knight Tr.*, 303 F.3d at 680 ("[I]t is imperative that bankruptcy courts make thorough and specific findings of fact to support their conclusions ....").

The Trusts invoke *U.S. Bank National Ass'n ex rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC*, 583 U.S. 387 (2018), to argue that the Bankruptcy Court's application of law to fact should be reviewed *de novo*. Opening Br. at 19-20. *Lakeridge* points the other way. The Supreme Court explained that the standard of review for a mixed question turns on "whether answering it entails primarily legal or factual work," and that when mixed questions "immerse courts in case-specific factual issues," "appellate courts should usually review a decision with deference." *Id.* at 396. It then held that a bankruptcy court's determination whether a transaction was conducted at arm's length—"about as factual sounding as any mixed question gets"—is "subject only to review for clear error." *Id.* at 397, 399. The Third Circuit applies *Lakeridge* the same way. *See In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020) (reviewing choice of legal test *de novo* but

"application of legal precepts to the facts" for clear error because the question was "fact-specific"). So too here. The Trusts concede that whether a trust was created primarily for a business purpose "requires evaluating all the facts and circumstances." Opening Br. at 21. Why Mr. Atiyeh created the Trusts, and what the Trusts actually did, are questions of historical fact and inference that the Bankruptcy Court resolved after an evidentiary hearing at which Mr. Atiyeh testified. Those findings may not be set aside because this Court "would have decided the case differently"; "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). Although the Bankruptcy Court's choice of legal test is reviewed *de novo*, the Trusts' challenge to that test is academic: the Bankruptcy Court held that the absence of a business purpose—the very test the Trusts urge—"is dispositive," App. 22, and found that the Trusts had none.

## V. STATEMENT OF THE CASE

This appeal arises from bankruptcy cases involving Appellee Lehigh Valley 1, LLC, as the Lender, and Appellants Whitehall Trust and Saucon Trust, as former debtors. *See In re Whitehall Trust*, Case No. 25-15241 (PMM) (Bankr. E.D. Pa. 2025) (jointly administered). The bankruptcy cases were initiated after Lender brought foreclosure actions in this Court against the Trusts for their failures to make any payments on their respective mortgages and loans for over four years. The Bankruptcy Court dismissed the Trusts' bankruptcy cases, the order at issue in this appeal.

### A. The Loans and Defaults

In 2012, M&T Realty Capital Corporation ("M&T") provided a loan to an entity Abraham Atiyeh created, Whitehall Trust, which holds the real property on which the Whitehall Manor personal care home operates. The loan was secured by a mortgage on the real property located at 1177 6th Street, Whitehall, Pennsylvania. *See* ECF 41, at ¶ 10 (Case No. 25-15241). Similarly, M&T also provided a loan to a second entity Mr. Atiyeh created, Saucon Trust, which holds the real property on which the Saucon Valley Manor personal care home operates. This loan was similarly secured by a mortgage on the real property located at 1050 Main Street, Unit #1, Hellertown, Pennsylvania. *See id.* ¶ 11. The loans were insured by the U.S. Department of Housing and Urban Development ("HUD"). *See id.* ¶ 12.

Debtors Whitehall Manor and Saucon Valley Manor (collectively, the "Manor Debtors") lease these real properties from the Trusts and operate the personal care homes on them. *See id.* ¶ 11.

After the Trusts' payment defaults—neither has made a single voluntary mortgage payment on their loans since February 2021—the notes and mortgages were assigned by M&T to HUD effective November 16, 2022. *See id.* ¶¶ 12, 13. HUD then held a publicly advertised loan sale, as a result of which Lender became the owner of the loan documents. *See id.* Lender now holds mortgages on the Trusts' real property, a security interest in all of the Trusts' and the Manor Debtors' assets, including rent the Manor Debtors owe to the Trusts, and a security interest in and right to collect rents directly from all the residents living at the personal care homes operated by the Manor Debtors. *See id.* ¶¶ 12, 14.

Additionally, because of the Trusts' failure to pay real estate taxes, the Trusts' properties were subject to significant municipal tax liens which caused the properties to be listed for tax sale. *See id.* ¶¶ 15-16. The Trusts (through the Manor Debtors) entered into a tax repayment plan. *See id.* However, the Trusts still owe hundreds of thousands of dollars in delinquent pre-petition real estate taxes. *See id.*

### B. The Foreclosure Actions

Due to the Trusts' defaults, following more than three years of non-payment on their respective mortgages, Lender filed foreclosure actions against each of the Trusts in June 2024 (collectively, the "Foreclosure Actions"). *See* Case Nos. 5:24-cv-2627 (E.D. Pa. 2024) and No. 5:24-cv-2709 (E.D. Pa. 2024). This Court entered an order in the Foreclosure Actions appointing a Receiver for both properties for the benefit of Lender. Following a discovery dispute—during which the Trusts claimed that the Trusts and the Manor Debtors have no corporate relationship—this Court entered an order on December 19, 2025 ordering the Trusts to pay the Receiver a sanctions award by December 29, 2025. ECF 164 (Case No. 24-cv-02627); ECF 138 (Case No. 24-cv-02709). This December 19, 2025 Order also declared the 2023 amendments to the lease agreements (in which the Trusts sought to forgive millions of dollars in arrears owed by their affiliated tenants and to significantly reduce future rent payments from the Manor Debtors) "NULL, VOID, and OF NO LEGAL EFFECT." *Id.*

On December 26, 2025, just three days before the sanctions award against the Trusts was due to be paid, the Trusts and the Manor Debtors each filed a petition for bankruptcy.

### C. The Formation of Whitehall Trust

Mr. Atiyeh created the Whitehall Trust through the Trust Agreement of Whitehall Trust, dated as of August 1, 2007 ("Whitehall Trust Agreement"). App. 421. Atiyeh is the settlor of the Whitehall Trust. He created the Whitehall Trust primarily for tax and estate purposes. App. 432, at ¶ 11 (provision in the Whitehall Trust Agreement prohibiting Whitehall Trust from paying taxes). Mr. Atiyeh is also the primary beneficiary of Whitehall Trust. He is entitled to receive distributions of net income during his lifetime. App. 421, at ¶ 3.1. Upon his death, if his wife survives him, she is entitled to the net income from Whitehall Trust during her lifetime. App. 422, at ¶ 3.2.1. After the death of both Mr. Atiyeh and his wife, their children are the beneficiaries, entitled to receive both the net income and ultimately the corpus of the trust after a certain amount of time. App. 422-23, at ¶¶ 3.2.3, .4. The Whitehall Trust Agreement contains a spendthrift clause that specifically prohibits transfers of beneficial interests. App. 431, at ¶ 9.

As to both the Whitehall and the Saucon properties, HUD and M&T required Mr. Atiyeh to form a separate entity to hold the real property to limit liability and to insulate real estate ownership from potential downstream claims. *See* App. 29 ("Atiyeh testified that he formed the Trusts at the behest of his secured lenders, who apparently sought to insulate real estate

ownership from downstream operational liability."). Mr. Atiyeh himself "assumed M&T and HUD viewed the Trusts as vehicles for preserving the Manor properties and shielding their owners from lawsuits arising out of Manor operations." App. 6. Mr. Atiyeh chose to comply with this requirement by forming living trusts, *i.e.*, the Whitehall Trust and the Saucon Trust.

Pursuant to the Whitehall Trust Agreement, Mr. Atiyeh assigned by deed certain real property to Whitehall Trust. The deed states that it is a conveyance "from a person to a Trust created by him in which the only beneficiaries are the Grantor and his spouse and lineal descendants, and this transaction is therefore exempt from Pennsylvania real estate transfer tax." App. 442; *see also* App. 7. This real property is the sole asset of Whitehall Trust. App. 430, at ¶ 5. Whitehall Trust engages in no business other than owning this real property, leasing it to its affiliate, Debtor Whitehall Manor, and borrowing on a mortgage loan from Lender. Whitehall Trust has no employees, officers, or directors.

**D. The Formation of Saucon Trust**

Mr. Atiyeh likewise created the Saucon Trust through a Trust Agreement titled Saucon Trust, dated as of October 1, 2007, which was subsequently amended several times (as amended, "Saucon Trust

Agreement”). App. 298. Atiyeh is the settlor and primary beneficiary of Saucon Trust. He is entitled to receive distributions of net income during his lifetime. App. 298, at ¶ 2.1. Upon his death, if his wife survives him, she is entitled to the net income from Saucon Trust during her lifetime. *Id.* ¶ 2.2.1. After the death of both Mr. Atiyeh and his wife, their children are the beneficiaries, entitled to receive both the net income and ultimately the corpus of the trust after a certain amount of time. App. 298-99, at ¶¶ 2.2.3, .4. The Saucon Trust Agreement contains a spendthrift clause that specifically prohibits transfers of beneficial interests. App. 306, at ¶ 7 .

Pursuant to the Saucon Trust Agreement, Mr. Atiyeh assigned by deed certain real property to Saucon Trust. The deed specifically states that it represents a “TRANSFER FROM AN INDIVIDUAL TO A LIVING TRUST AND IS EXEMPT FROM REALTY TRANSFER TAX.” App. 294; *see also* App. 6. This real property is the sole asset of Saucon Trust. App. 315. Saucon Trust was created to insulate the property from operational liabilities and for tax purposes. *Id.* ¶ 9 (prohibiting Saucon Trust from paying taxes). Saucon Trust engages in no business other than owning this real property, leasing it to its affiliate, Debtor Saucon Valley Manor, and borrowing on a mortgage loan from Lender. Saucon Trust has no employees, officers, or directors.

### E. The Lease Agreements

Prior to the loan defaults and prior to Lender acquiring the loans, the Lease Agreements (described in detail below) between the Manor Debtors, on one hand, and the property-owning Trusts, on the other hand, required substantial monthly rent payments. *See* App. 538; App. 579. However, effective as of September 21, 2023—after the mortgages had defaulted, after HUD had taken over the loans, and after HUD had auctioned the loans—Mr. Atiyeh unilaterally, on behalf of the Trusts and the Manor Debtors, drafted, prepared, and executed two purported lease amendments (the "Fourth Amendment" for the Whitehall property and the "Sixth Amendment" for the Saucon property) (together, the "2023 Lease Amendments"). App. 8-9.

The 2023 Lease Amendments effectively waived all past-due rent payment obligations for the Manor Debtors from March 2021 through September 2023—which the Manor Debtors to that point had not paid—and for the year 2024. They also capped the maximum rent for the year 2025 at an amount less than the amounts paid by the Manor Debtors for taxes and capital improvements, which counted as a credit against the rent amount. App. 9. The 2023 Lease Amendments were designed to strip rental income from the property-owning Trusts (whose cash flow was pledged to the

mortgage lender) and to keep all cash in the operating Manor Debtors. As noted, this Court later declared them void. *See supra* Section V.B.

The Whitehall property is thus governed by an Operating Lease Agreement originally dated August 14, 2008, amended by the First through Third Amendments. *See* App. 538. With the Fourth Amendment voided by the December 19 Order, the Third Amendment is the governing Amendment, dated and effective as of August 31, 2018. The Whitehall Lease Agreement is a triple net lease, meaning the lease requires Whitehall Manor to pay—separate from and in addition to the stated amount of monthly rent—all taxes, insurance, maintenance, and other operating expenses of the property. *See* App. 550, at § 4.05. The Saucon Lease Agreement contains a similar triple net provision. *See* App. 581, at § 5. Both of these Leases have now expired.

### F. The Dismissal of the Trusts' Bankruptcy Cases

On January 14, 2026, Lender filed a motion to dismiss the bankruptcy cases of the Trusts because they are trusts not eligible to be debtors under Section 109 of the Bankruptcy Code, 11 U.S.C. § 109. App. 139. Lender argued that "[a]s a general matter, trusts are not eligible for bankruptcy relief." *In re Joobeen*, 385 B.R. 599, 613 (E.D. Pa. 2008). In particular, "real property trusts cannot be debtors under the Bankruptcy Code…." *Id.* at 614. Rather,

only "business trusts" are eligible to be debtors under the Bankruptcy Code. *See* 11 U.S.C. § 101(9)(A)(v) & (41), 109(b) & (d).

The Bankruptcy Court agreed and granted Lender's motion to dismiss the Trusts' bankruptcy cases (the "Dismissal Order"). App. 5-34. Specifically, the Bankruptcy Court found: (1) the Trusts "neglected to register as business trusts pursuant to the applicable Pennsylvania statute"; (2) "[b]eneficial interests in the Trusts are not transferable"; (3) "[t]he Trusts are not meant to exist in perpetuity"; (4) the Trusts "were not formed by investors"; and (5) "the Trusts were not created and maintained for business purposes." App. 33. As a result, the Bankruptcy Court concluded "[t]he Trusts are not 'business trusts' within the meaning of the Bankruptcy Code." *Id.*

### G. The Conflict of Interest Between the Trusts and the Manor Debtors

After filing bankruptcy, the Trusts and the Manor Debtors sought to employ the same bankruptcy counsel, Dilworth Paxson LLP ("Dilworth"), and Lender objected. As this Court has recounted, in the Foreclosure Actions "the Trusts and their counsel repeatedly represented that they were completely separate and distinct from the Manor entities, with completely differing interests and ownership." ECF No. 23, at 2 (Case No. 5:26-cv-0662-CH). In the bankruptcy cases, the same parties reversed course, contending that they are "co-dependent entities" whose "interests are fully aligned," and

Mr. Atiyeh testified that the earlier representations to this Court were "a mistake," "improper," and "incorrect." *Id.* at 2-3.

Despite acknowledging that there were conflicts of interest between the Manor Debtors and the Trusts, the Bankruptcy Court approved Dilworth as joint bankruptcy counsel for the Manor Debtors and the Trusts. However, on May 18, 2026, this Court properly vacated the Bankruptcy Court's order authorizing Dilworth to jointly represent the Manor Debtors and the Trusts as bankruptcy counsel, finding that "an actual conflict of interest exists that bars Dilworth from representing both groups of Debtors." ECF No. 23, at 5 (Case No. 5:26-cv-0662-CH).

## VI. SUMMARY OF THE ARGUMENT

The Trusts challenge the Dismissal Order on two grounds: (1) the Bankruptcy Court applied the wrong test to determine whether the Trusts are business trusts, and (2) the Trusts have a business purpose and thus should have been found to be business trusts. The Trusts are wrong on both accounts for the following reasons.

*First*, the Trusts' focus on a single-factor test—whether the Trusts had a business purpose—does not help them. As the Bankruptcy Court found, the Trusts simply did not have a business purpose. The Trust documents demonstrate that Mr. Atiyeh intentionally created and defined the Trusts as "Living" or ordinary trusts, not business trusts. As the Bankruptcy Court also found, the record demonstrates that Atiyeh intended the Trusts to preserve real estate, limit liability, and facilitate estate-planning.

Moreover, the test adopted by the Bankruptcy Court—which looks at other factors—was proper because it is necessary to consider the characteristics of business trusts—beyond just the Trust's primary purpose—to determine whether the trust is a business trust. The characteristics, often articulated as factors or indicia of business trusts, are what actually show whether a trust was set up to conduct business, or was instead created to preserve the trust's assets. In any event, the Bankruptcy Court treated the

absence of a business purpose as "dispositive," App. 22, so its consideration of additional factors could not have changed the outcome.

*Second*, under any definition of "business trust" that this Court adopts, the Trusts are not business trusts. Not only did Mr. Atiyeh not create the Trusts with the purpose of conducting business, but they do not have the requisite indicia of corporateness necessary for a trust to be a business trust.

## VII. ARGUMENT

### A. Legal Standard

This Court should affirm the Bankruptcy Court's Dismissal Order because the Trusts are not eligible to file for bankruptcy. Bankruptcy relief is limited to those entities that are eligible for such relief. *See generally* 11 U.S.C. § 109. With limited exceptions that are not relevant here, only a "person" may be a debtor in a case under Chapter 7 or 11. *Id.* § 109(b), (d). The Bankruptcy Code defines the term "person" to include a "corporation." *Id.* § 101(41).

"As a general matter, trusts are not eligible for bankruptcy relief." *Joobeen*, 385 B.R. at 613. Under the Bankruptcy Code, a trust is eligible to be a chapter 7 or 11 debtor only if it is a "business trust." 11 U.S.C. §§ 101(41), 109(b) & (d). Specifically, the term "corporation" is defined to include a "business trust." *Id.* § 101(9)(A)(v). No other form of trust is eligible for bankruptcy relief. *See In re EHT US1, Inc.*, 630 B.R. 410, 423 (Bankr. D. Del.

2021) ("[T]he only trust within the definition of a 'person' is a 'business trust.'") (quotation omitted); *Cath. Sch. Emps. Pension Tr.*, 599 B.R. at 652 ("[F]or a trust to be eligible to file a bankruptcy petition, it must qualify as a business trust.") (quotations omitted). The Bankruptcy Code does not further define what a "business trust" is.

As the party who filed the bankruptcy petitions, the Trusts bear the burden of proving their eligibility to be Chapter 11 debtors. *See, e.g., Secured Equip. Tr.*, 38 F.3d at 89.

Federal law governs the determination of whether the Trusts are business trusts. *See Kenneth Allen Knight Tr.*, 303 F.3d at 679 ("[T]he definition of 'business trust' properly belongs to federal, rather than state, law."); *Cath. Sch. Emps. Pension Tr.*, 599 B.R. at 654 (same) (collecting cases); *see also* App. 12-15 ("At the Hearing, the parties stipulated that federal law should decide the outcome here. The Court agrees."); App. 14, 275-76, 288.

**B. What is a Business Trust?**

Although neither the Supreme Court nor the Court of Appeals for the Third Circuit has squarely addressed what constitutes a business trust under Section 101(9)(A)(v) of the Bankruptcy Code, these courts have addressed this question in other contexts, such as federal tax obligations and diversity

jurisdiction. *See, e.g.*, *Morrissey v. Comm'r of Internal Revenue,* 296 U.S. 344, 359 (1935) (defining a business trust for federal tax purposes); *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 40 (3d Cir. 2018) (defining "business trust" to determine citizenship for diversity jurisdiction); *Little Four Oil & Gas Co. v. Lewellyn*, 35 F.2d 149, 150 (3d Cir. 1929) (defining a business trust for federal tax purposes).

Numerous other courts, including courts of appeal and district and bankruptcy courts—some of which are within the Third Circuit—have specifically addressed what constitutes a business trust under the Bankruptcy Code. *See, e.g.*, *Kenneth Allen Knight Trust*, 303 F.3d at 680; *Secured Equip. Tr*ust, 38 F.3d at 89 ; *Joobeen*, 385 B.R. at 613; *In re Eagle Trust*, Civ. A. No. 98–2531, 97–23298, 1998 WL 635845, at *4-*5 (E.D. Pa. Sept. 16, 1998); *In re Dille Fam. Tr.*, 598 B.R. 179, 190 (Bankr. W.D. Pa. 2019).

These courts have articulated tests comprising numerous overlapping factors that they consider when evaluating whether a trust is a business trust eligible to be a debtor under the Bankruptcy Code. While the precise language of these tests may vary, they primarily look to whether the trust was formed to carry on a for-profit business, or for the purpose of preserving property for the benefit of the trust's beneficiaries ***and*** whether the trust has

the fundamental traits of a corporation. *See, e.g.*, *Joobeen*, 385 B.R. at 613. Courts consider whether the trust has the fundamental traits of a corporation because these traits demonstrate that the trust operates with a business purpose. *See N. Hills Vill. LLC v. LNR Partners, LLC*, 479 F. Supp. 3d 189, 198 (W.D. Pa. 2020) ("These [factors] are helpful benchmarks which assist the Court in conducting a holistic evaluation of the issue before the Court.... [T]hey orient the Court in getting at the answer to the underlying question of 'what is the [] Trust's purpose?'"); *Secured Equip. Tr.*, 38 F.3d at 89 (requiring that a trust must show more than just a mere "engage[ment] in business-like activities to qualify as a business trust").

### 1. Courts have applied various tests for whether a trust is a business trust

The Court of Appeals for the Third Circuit first addressed the definition of a business trust in the context of assessing taxes. *See Lewellyn*, 35 F.2d at 150. In *Lewellyn*, the court divided trusts into two classes—business trusts and non-business trusts. Class one—***non-business trusts***—involve trusts "where the trustees merely collect dividends or interest, or rentals, and distribute them among the shareholders." *Id.* Class two—***business trusts***—is comprised of trusts "where a trust is organized or declared for business purposes and the trustees carry on an active business for profit[.]" *Id.* "The real test is whether the shareholders or trustees, or both combined, carry on

business for profit, and, if they do, they constitute a business trust … with liability for taxes." *Id*.

The Supreme Court of the United States adopted a similar test for business trusts in the context of taxes, but it articulated more specific factors to define a business trust. *See Morrissey*, 296 U.S. at 359. The Bankruptcy Court summarized *Morrissey* as "defin[ing] business trusts as those: (1) created *and* maintained for a business purpose; (2) whose property is held by trustees; (3) with centralized management; (4) which continue uninterrupted by deaths of beneficial owners; (5) whose interests are transferable; and (6) with limited liability." App. 16; *accord In re Tiel Tr. I FBO Paula T. Douglass,* 656 B.R. 810, 838 (Bankr. D. Colo. 2024) (citing *Morrissey*, 296 U.S. at 357-59).

More recently, the Court of Appeals for the Third Circuit defined "business trust" in the context of citizenship for diversity jurisdiction. *See GBForefront*, 888 F.3d at 40. "The primary point of distinction [between a traditional trust and a business trust] is … that a traditional trust exists as a fiduciary relationship and not as a distinct legal entity. Another general distinction between traditional and business trusts is that a traditional trust facilitates a donative transfer, whereas a business trust implements a bargained-for exchange." *GBForefront*, 888 F.3d at 40 (citations omitted).

Under *GBForefront*, a court should undertake "at least two inquiries" when deciding whether a trust is a business trust. *First*, courts must "look to the law of the state where the trust was formed[.]" *Id*. *Second*, courts must "focus[] on the purpose of the trust[.]" *Id*. (citations omitted).

In *North Hills Village, LLC*, the United States District Court for the Western District of Pennsylvania applied *GBForefront* and drew on the "two overarching elements of a 'business trust'" identified in *Dille Family Trust*: "(1) whether the trust was created for the purpose [of] transacting a business for profit and (2) whether the trust has 'indicia of corporateness.'" *N. Hills Vill.*, 479 F. Supp. 3d at 197. Specifically, as to the second factor, the district court articulated the "indicia" of a business trust as follows:

> 1. The trust implements a bargained-for exchange.
>
> 2. The trust is formed by a group of investors who contribute capital to the enterprise with the expectation of receiving a return on their investment.
>
> 3. The trust creates a continuity of the business enterprise uninterrupted by death among the beneficial owners.
>
> 4. The trust permits the transfer of interests.

*Id*. at 197 (citations omitted).[1]

[1] "[A]dditional indicia" of business trusts include: (1) "[s]ettlors in a traditional trust receive no compensation for the conveyance of the property into the trust, whereas the settlor in a business trust always receives payment for assets conveyed to the trust"; (2) "[i]n traditional trusts, the settlor is

The Court of Appeals for the Second Circuit was the first court of appeals to squarely address "business trust" in the context of determining eligibility to be a debtor under the Bankruptcy Code. *See Secured Equip.*, 38 F.3d at 89. The Second Circuit recognized "two general points" informing the definition of a business trust. *Id. First,* "most courts agree that a basic distinction between a business trust and other trusts is that business trusts are created for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res." *Id.* (citations omitted); *see also Kenneth Allen Knight Trust*, 303 F.3d at 680.

*Second*, "while a trust must engage in business-like activities to qualify as a business trust, such activity, without more, does not necessarily

---

seldom the sole or principal beneficiary"; (3) "[i]n business trusts, the trust res consists of property originally contributed by the beneficiaries themselves"; (4) "[s]ome business trusts vest title to the trust property in the trust as a legal entity, rather than in the trustees, as is the case with traditional trusts"; (5) "[b]usiness trusts typically refer to beneficiaries as 'shareholders' or 'members'"; (6) "[m]embers of a business trust can freely transfer their beneficial interests in the trust"; (7) "[m]embers of a business trust can have the ability to elect, remove, or control the various trustees and amend the terms of the trust, which is ordinarily difficult or impossible in traditional trusts without the settlor's consent"; (8) "[s]ettlors of a business trust almost always retain a residual interest in the trust res that remain after a business transaction is concluded, whereas the settlor of a traditional trust may or may not retain an interest"; and (9) "[b]usiness trusts feature centralized management, perpetual existence, and state registration requirements." *N. Hills Vill.*, 479 F. Supp. 3d at 198 (citations omitted); *accord RBx Cap., LP v. Xorax Fam. Tr.*, Civ. No. 21-3774, 2023 WL 3324682, at *3 (E.D. Pa. May 8, 2023).

demonstrate that a trust is a business trust." *Secured Equip.*, 38 F.3d at 89. In light of these two overarching principles, the Second Circuit recognized that whether a trust is a business trust "is based on a very fact-specific analysis of the trust at issue." *Secured Equip.*, 38 F.3d at 89.

Based in part on the two factors set forth in *Secured Equipment*, this Court articulated a test for determining whether a trust is a business trust in the context of eligibility to be a debtor under the Bankruptcy Code. *See Eagle Trust*, 1998 WL 635845, at *4-*5; *Joobeen*, 385 B.R. at 613. "[T]he key elements of a business trust are as follows:

> (1) the trust was formed for the primary purpose of transacting business or commercial activity, as opposed to preserving assets;
>
> (2) the trust was formed by a group of investors who contribute capital to the enterprise with the expectation of receiving a return on their investment;
>
> (3) the trust was created in compliance with state law; and
>
> (4) the beneficial interests of the trust must be freely transferable."

*Joobeen*, 385 B.R. at 613 (quoting *Eagle Trust*, 1998 WL 635845, at *5).

Finally, two bankruptcy court decisions within the Third Circuit are also relevant. *See Dille Fam. Trust*, 598 B.R. at 194-95; *In re Blanche Zwerdling Revocable Living Tr.*, 531 B.R. 537, 545 (Bankr. D.N.J. 2015). In *Dille Family Trust*, the bankruptcy court set forth a two-part test:

(1) "whether the trust itself was created for the purpose of transacting business for a profit (as opposed to merely preserving a res for beneficiaries);" and (2) "whether the trust in-fact *has all of the indicia of a corporate entity*." 598 B.R. at 194 (emphasis added). "If any one of these two characteristics is not present, then the trust is not a 'business trust' and is ineligible for bankruptcy relief under Chapter 11 pursuant to 11 U.S.C. § 109(d)." *Id.* The test in *Blanche Zwerdling* more broadly provides that "[t]he focus is on both the purpose of the trust and *the actual operations of the trust*." 531 B.R. at 545 (emphasis added). Again, these tests go beyond considering just the primary purpose of the trust.

### 2. The test adopted by the Bankruptcy Court

The Bankruptcy Court considered these decisions and synthesized its own version of these tests, which it properly applied to find that the Trusts are not business trusts. *See* App. 15-22. The Bankruptcy Court recognized "certain throughlines" in the various tests, which informed the court's formulation:

> Among the most important attributes of a business trust are: (1) existence as such under applicable state law; (2) transferable, beneficial interests; (3) perpetual existence; (4) formation by investors; and (5) creation *and* maintenance for the purpose of conducting business. Although these criteria are not exhaustive, failure to satisfy the last factor is dispositive.

App. 22.

Against the backdrop of the record in the bankruptcy proceedings, the Bankruptcy Court applied these five factors to the facts before it and concluded that the Trusts are not business trusts and are not eligible to be debtors under the Bankruptcy Code. *See* App. 22-33. The Bankruptcy Court held that the Trusts are not business trusts because the Trusts "neglected to register as business trusts pursuant to the applicable Pennsylvania statute," the "[b]eneficial interests in the Trusts are not transferable," "[t]he Trusts are not meant to exist in perpetuity," the Trusts "were not formed by investors", and critically, "the Trusts were not created and maintained for business purposes." App. 33.

The Bankruptcy Court not only reached the correct conclusion, but it properly considered factors beyond just the Trusts' purpose to validate its finding that the Trusts are not business trusts.

### C. The Test the Trusts Propose Is Incomplete, and Even So, the Trusts do Not Satisfy This Standard

The Trusts propose the following "rule" to determine whether a trust is a business trust: "a trust qualifies as a 'business trust' under the Bankruptcy Code if created primarily for the purpose of transacting business or carrying on activity for profit, rather than merely to hold, preserve, and distribute property for beneficiaries." Opening Br. at 23. The Trusts contend that

"[c]orporate-like features"—such as the factors set forth above—"may be relevant evidence of business character but are not statutory prerequisites." *Id.* Because they know that these features weigh against finding that the Trusts are business trusts, the Trusts assert that "features such as unbending adherence to state law procedures, indefinite existence, transferable interests, or other corporate hallmarks may aid in evaluating a trust's business character. Yet they are not (and should not be) absolute prerequisites, and none displaces the fundamental inquiry into the trust's primary purpose." *Id.* at 30. Thus, the Trusts actually seek to narrow the test for business trusts and ignore these critical "[c]orporate-like features". *Id.* at 23. The Trusts contend that "[d]efining a 'business trust' by reference to business purpose … presents a reasonable and workable standard in line with the statutory text." *Id.* at 29.

The Trusts' arguments falls apart because they do not satisfy their own test, and the test they propose is incomplete in any event.

### 1. The Trusts are not business trusts because Atiyeh did not create them for a business purpose

As an initial point, the Trusts' argument fails— even under its proposed business-purpose-only test. Everything about the Trusts shows Mr. Atiyeh did not create them with the purpose of conducting business. Rather, a review of the relevant Trust documents—the Trust Agreements, the Trustee's

Certificates, the deeds of the Trusts, and the lease agreements between the Trusts and the Manor Debtors—demonstrates that Atiyeh created the Trusts for estate planning purposes and to preserve real estate, not to conduct business. As the Bankruptcy Court found as fact, the "original trust instruments…[b]oth contain 'Spendthrift Clause[s]'" and "[e]ach instrument now contemplates the same intra-family succession plan." App. 8.

Starting with the Trust Agreements, the language in the agreements demonstrates that the Trusts were not intended to be business trusts. Per the Trust Agreements, Mr. Atiyeh is the current primary beneficiary. App. 421, at ¶ 3.1. In the event that Mr. Atiyeh predeceases his wife, she becomes the primary beneficiary of the Trusts. App. 422, at ¶ 3.2.1. Upon the deaths of both Mr. Atiyeh and his wife, Mr. Atiyeh's children become the primary beneficiaries. App. 422-23, at ¶¶ 3.2.3, .4. As the Bankruptcy Court found, "Atiyeh … intended for the Trusts to serve as a means of bequeathing part of his residuary to his descendants." App. 29. This is estate planning, not operating a business.

The Trust Agreements also contain spendthrift clauses which ***prohibit*** transfers of the Trusts' beneficial interests:

> *Spendthrift Clause*: The interest of any beneficiary in or to principal and income of the Trust Estate shall not be subject to assignment, alienation, pledge, attachment, or claims of creditors of such beneficiary

> or anyone claiming by, through or under such beneficiary and may not otherwise be voluntarily or involuntarily alienated or encumbered by such beneficiary, except as may be otherwise expressly provided herein.

App. 431, at ¶ 9; App. 306, at ¶ 7. "[A] spendthrift clause in the Trust Agreement is very powerful evidence that the Trust does not have a business purpose." *Tiel Trust*, 656 B.R. at 846 (noting that "[b]usiness trusts typically do not have spendthrift provisions").[2]

Further, under the Trust Agreements, the Trusts do not exist in perpetuity. As to Whitehall Trust, the Whitehall Trust Agreement expressly sets a term of fifty years. *See* App. 425, at ¶ 3.6 ("The Term of the Trust shall be fifty (50) years[.]"). As to both the Whitehall Trust and the Saucon Trust,

---

[2] *See also In re Two Rivers Irrevocable Tr.*, 653 B.R. 284, 290 (Bankr. M.D. Ga. 2023) ("[A] trust which includes an enforceable spendthrift clause is powerful evidence that the trust does not have a business purpose." (quotations omitted)) (concluding that the Trust, which contained a spendthrift provision, "was not created for a business purpose"). Courts have long observed that "every case that has involved a restriction on the transferability of the beneficiaries' interest … has held the trust did not qualify as a [bankruptcy] debtor." *In re Quadruple D Trust*, 639 B.R. 204, 238-39 (Bankr. D. Colo. 2022) (quoting *In re Woodsville Realty Tr.*, 120 B.R. 2, 6 (Bankr. D.N.H. 1990)) (concluding that in light of the spendthrift clause, "it is self-evident that the Trust is not a 'business trust' under Section 101(9)"); *see also In re Sung Soo Rim Irrevocable Intervivos Tr.*, 177 B.R. 673, 678 (Bankr. C.D. Cal. 1995) ("Transferability of the trust's beneficial interest also appears to be critical in distinguishing between a 'business trust' and a traditional trust.").

the terms of the respective Trust Agreements provide for "estate succession and intra-family distribution of the res" at a set future time. App. 26-27.

Because the Trusts do not have a perpetual existence, "it is safe to conclude that the Trusts are family trusts," and not business trusts. App. 27 (citing *Tiel Trust*, 656 B.R. at 848; *Two Rivers*, 653 B.R. at 290). In *Tiel Trust*, the trust continued only for the lifetime of the beneficiary and terminated upon their death. 656 B.R. at 848. "The termination upon death provision establishes that the Trust is merely a typical family donative trust." *Id*. Here, the same logic applies because the only beneficiaries of the Trusts are Mr. Atiyeh and his wife and children, and the Trust Agreements contemplate termination of the Trusts at a point in time following Mr. Atiyeh's death. *See Quadruple D*, 639 B.R. at 237 ("This provision confirms that all the beneficiaries of the Trust are family members and suggests that the Trust is a typical family trust, not a 'business trust.'").

The Trusts provide no convincing evidence that they are business trusts. Although the Trusts contend that the Trust Agreements authorize "the Trustees to hold property as an investment; to rent or lease property; to make all necessary repairs and improvements; to pay taxes, insurance premiums, and other assessments; and to consent to the sale, mortgage, or lease of property," Opening Br. at 32, the amendments to the Trust

Agreements specifically limit any apparent business purpose of the Trusts. *See* App. 315; App. 483. For example, the Second Amendment to the Saucon Trust Agreement provides:

> Unless otherwise approved in writing by HUD, the Trust's business and purpose shall consist solely of the acquisition, ownership, operation and maintenance of the Project [the Saucon property located in Hellertown, Pennsylvania], and activities incidental thereto. The Trust shall not engage in any other business or activity. The Project shall be the sole asset of the Trust, which shall not own any other real estate other than the Project.

App. 315, at § 14(c)(viii). The First Amendment to the Whitehall Trust Agreement similarly specifically limits any business purpose of Whitehall Trust. App. 483, at ¶ 4 (adding Section 15.8 to the Trust Agreement). These limitations are evidence that Atiyeh did not create or maintain the Trusts for a business purpose; rather, they were created to preserve the real estate.

Even if the Trusts were purportedly authorized to engage in limited business-like activities, that is not enough to make them business trusts. *See, e.g., Secured Equip.*, 38 F.3d at 89; *Dille Fam. Trust*, 598 B.R. at 195; App. 31 ("And although the trustee was empowered to *manage* trust business, sell and *lease* trust property, and *borrow* or lend money, such facts do not *per se* transform a trust into a 'business trust.'") (quoting *Dille Fam. Trust*, 598 B.R.

at 195). Further, as set forth below, the record does not support that the Trusts actually engaged in any business activities.

Nor did the Bankruptcy Court "overread" *Secured Equipment*. Opening Br. at 41. It relied on that decision for what the Second Circuit actually held: a trust "created to serve as a vehicle to facilitate a secured financing" was "not established to run a business enterprise," even though it leased property and retained professionals. 38 F.3d at 90; *see* App. 28-29. Much the same is true of these Trusts, which by their own account "were created as part and parcel of the business financing structure itself." Opening Br. at 39.

Turning next to the Trusts' deeds, in the deeds transferring the property to the respective trusts, Mr. Atiyeh refers to the Trusts as living or ordinary trusts, as opposed to business trusts. *See* App. 292; App. 440. The Saucon deed recites a transfer "TO A LIVING TRUST," App. 294, and the Whitehall deed a transfer to a trust "in which the only beneficiaries are the Grantor and his spouse and lineal descendants," App. 442. These documents demonstrate Mr. Atiyeh's specific intent to form these Trusts as living or ordinary trusts, not business trusts.[3] *See Quadruple D*, 639 B.R. at 237.

[3] The Trusts' response to this language in the Trusts' deeds relates to the Pennsylvania Board of Finance and Revenue's decision, which provides

Looking next at the lease agreements between the Trusts and the Manor Debtors, there are two key elements that support the conclusion that the Trusts were not intended to be business trusts. *First*, the way the rent is calculated in the leases confirms that the Trusts were conduits for debt service rather than independent profit-seeking enterprises. Specifically, the Saucon Lease Agreement provides that the Manor Debtors agree to pay the Trusts the greater of $1,705,421 annually or:

> (ii) During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of:
>
> > a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and
> >
> > b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and
> >
> > c. Annual Deposit for Reserve for Replacement as required by the HUD Mortgage; and
> >
> > d. Annual Property Insurance Premiums for coverages for the Leased Premises required to be maintained by Owner under the HUD Mortgage; and
> >
> > e. Annual Property Taxes for the Leases Premises.

App. 615-16, ¶ 1 (amending Section 4.02(A) of the Lease). The latter rent calculation essentially contemplates that the Manor Debtors make the Trusts

---

no support for their argument, as explained below. *See infra* at Section VII.D.1.a.

whole, with a modest cushion, for the mortgage payments the Trusts are required to make as owners of the real property. Rent was thus derived from the Trusts' carrying costs, not negotiated at arm's length. And, as the Bankruptcy Court found, any surplus that reached Mr. Atiyeh through the Trusts existed "only because he chose to charge—and/or because HUD required him to charge—the Manors more rent than the Trusts paid their mortgagees"; "[t]he Manors are the real profit centers." App. 28.

*Second*, the lease agreements for both the Whitehall and Saucon properties contain triple net provisions, meaning the Manor Debtors, and not the Trusts, are responsible for performing all maintenance on the properties. *See* App. 550, at § 4.05; App. 581, at § 5. The Trusts contend that they are business trusts because they performed maintenance and improved the real property on which the Manor Debtors operate their personal care homes. *See* Opening Br. at 21. However, per the lease agreements, it is the Manor Debtors who are responsible for maintaining the real property. The Bankruptcy Court expressly found that the record does not support that the Trusts bore any financial burden for the maintenance for the real property. *See* App. 29. The Trusts call that finding unsupported, Opening Br. at 18 n.8, but it rests on the leases themselves, which obligate the Manor Debtors to "make all repairs, renewals, replacements[,] and improvements to the

Leased Premises," App. 9, and on Mr. Atiyeh's testimony that his own construction company performs all Manor repairs, App. 10 (citing App. 249).

**2. The Trusts are not business trusts because they were not maintained to conduct business**

The Trusts also fail to satisfy their burden of demonstrating that they were maintained to conduct business. As the Bankruptcy Court found, "[t]he record is bereft of any indication that the Trusts ever had officers or retained employees." App. 29. The record also indicates that the Trusts were not financially responsible for paying for "Manor construction, renovation, and upkeep." *Id.* Rather, the Manor Debtors, pursuant to the triple net clauses in their leases, bore the financial burden for these services. *See id.* Indeed, on cross-examination Mr. Atiyeh "conceded that the Trusts were only engaged in the business of leasing their properties to the Manors," and the Trusts "have no other means of generating income." App. 10 (citing App. 244-45).

Further, the Bankruptcy Court reasoned that "[b]usiness trusts engage in more than the mere collection and distribution of rents. Yet, it appears that the sum of the Trusts' 'operational' output was their collection of rental income for distribution to Atiyeh and his secured lenders." *Id.* (citing *Lewellyn*, 35 F.2d at 150). Thus, nothing about the Trusts' operation suggests that they were maintained for the purpose of conducting business.

"A trust that is passive because 'it is not engaged in active management of assets with a goal of increasing its profitability or value'—irrespective of whether it is involved in commercial transactions—is not a business trust eligible to file bankruptcy." *In re Cath. Sch. Emps. Pension Tr.*, 584 B.R. 82, 87 (Bankr. D.P.R. 2018) (citation omitted), *aff'd sub nom. Cath. Sch. Emps. Pension Tr.*, 599 B.R. 634 (B.A.P. 1st Cir. 2019); *see also Tiel Trust*, 656 B.R. at 847 ("[E]ngaging in some passive business activity, such as collecting rents from the seven operable railroad cars or collecting interest from two bank accounts does not make the Trust a business trust. Instead, the Trust is simply a family donative trust."); *Eagle Trust*, 1998 WL 635845, at *5 (concluding that the trust was not formed for the purpose of transacting business because the trust "simply holds real estate and personal property, receives some income from these properties, and pays the maintenance and expenses of holding the property for the benefit of [the settlor] and his family"); *Blanche Zwerdling*, 531 B.R. at 545-46 (dismissing case of trust that leased and maintained an 18-unit mixed-use building—a fact omitted from the Trusts' description of the case, *see* Opening Br. at 43—because that activity was merely "ancillary to preserving" the property). Accordingly, the Trusts' "passivity weighs in favor of dismissal." App. 29.

The Trusts contend that they engage in business because "the properties were placed in trust and repeatedly mortgaged for tens of millions of dollars, for the purpose of refinancing, improving, and maintaining them." Opening Br. at 34. The Trusts rely on *In re Rubin Family Irrevocable Stock Trust* to support this proposition. In *Rubin,* the court held that a trust was a business trust and that such risk-taking with the trust's res indicated that the primary purpose of the trust was not to protect the res. No. 13–72193–dte, 2013 WL 6155606, at *9 (Bankr. E.D.N.Y. Nov. 21, 2013). However, the circumstances of the risk-taking by the trusts in *Rubin* is easily distinguishable from the facts here. The trusts in *Rubin* "acquired a fairly sophisticated network of subsidiary entities to deal with its realty holdings, which generate significant annual revenue"; the "trusts took business risks in order to increase the monetary value of assets they purchased;" and the trusts invested money in finding new, profitable properties. *Id.*

Here, although the Trusts mortgaged the properties, they did so only to refinance and to maintain the properties they already held. *See* Opening Br. at 34. The Trusts did not have numerous real estate holdings generating revenue, like in *Rubin*. Rather, each Trust held a single piece of real estate, leased to a single affiliated tenant. Further, the Trusts were expressly

prohibited from acquiring additional real estate, making them dissimilar from the trusts in *Rubin*. *See* App. 315; App. 483.

The other decisions on which the Trusts rely are also readily distinguishable. In *Knight Trust*, the trust was a holding company for subsidiaries that owned real estate investments, fast-food franchises, and restaurant interests, and "most if not all" of the subsidiaries' financial activities ran through the trust's bank accounts; moreover, the appellants there "appeal[ed] only the choice of law" and did "not contest the finding that the Trust was a business trust." 303 F.3d at 674-75, 680. The trust in *In re John Q. Hammons Fall 2006, LLC* owned hotels, a baseball stadium, and the equity of subsidiaries holding hotels, casinos, and office buildings—more than $2 billion in assets—such that "the overwhelming body of the Hammons Trust's work was to operate a massive business enterprise." 573 B.R. 881, 895 (Bankr. D. Kan. 2017). And in *In re Jin Suk Kim Trust*, the trustee used retained profits and heavy leverage to buy and sell a succession of shopping centers "to maximize its profits and the value of its assets." 464 B.R. 697, 704-05 (Bankr. D. Md. 2011). Each of those trusts actively acquired, operated, and traded business assets. The Trusts here did none of that.

Finally, the Trusts fault the Bankruptcy Court for noting that they had not collected rent in more than five years, arguing that the Code contains no

"ongoing business" requirement. Opening Br. at 43-44. But the Bankruptcy Court imposed no such requirement. It simply observed that, "assum[ing] *arguendo*" that rent collection could evidence a business purpose, the failure to collect rent was further evidence that Mr. Atiyeh did not intend the Trusts to have a business purposes and in fact was "utterly ambivalent about collecting the millions of dollars in rent [the Trusts] are due" from their own affiliates, the Manor Debtors. App. 32. And because the Bankruptcy Court had already found that Mr. Atiyeh did not create or maintain the Trusts for a business purpose, App. 28-32, the Trusts' recent inaction simply cements the court's finding.

#### 3. The Trusts' business-purpose-only test is incomplete

Even if they could pass their own proposed test, which they cannot, the business-purpose-only test proposed by the Trusts is incomplete and untenable. The Trusts' proposed test ignores the indicia of business trusts that courts repeatedly consider and require when determining whether a trust is a business trust, including in the context of determining eligibility to be a debtor under the Bankruptcy Code. *See supra* Section VII.B.1.

These factors—which the Trusts contend "are not … absolute prerequisites" for business trusts—are what demonstrate whether the trust was intended to carry out a business purpose, and whether that intent was

effectuated over time. *See Dille Fam. Trust*, 598 B.R. at 194 (requiring that a trust have "all of the indicia of a corporate entity" otherwise "the trust is not a 'business trust' and is ineligible for bankruptcy relief under Chapter 11").

The Trusts' statutory arguments do not change this. They contend that Congress liberalized eligibility in 1978 by replacing the Bankruptcy Act's reference to a business "wherein beneficial interest or ownership is evidenced by certificate or other written instrument" with the term "business trust." Opening Br. at 24-25. But the Trusts acknowledge that the legislative history describes the new definition as "similar to" the old one. *Id.* at 25. And in adopting the phrase "business trust," Congress chose "a legal term of art" whose settled meaning, drawn from *Morrissey* and its predecessors, already included transferable interests, continuity of existence, and centralized management. *Tiel Trust*, 656 B.R. at 830, 838; *see* App. 16. Even the Sixth Circuit Court of Appeals, which read the 1978 change as a "liberalization," still requires that a trust be created with the primary purpose of transacting business, *Knight Tr.*, 303 F.3d at 679-80—the very showing the Bankruptcy Court found lacking.

Nor does 11 U.S.C. § 102(3), under which "includes" is not limiting, help the Trusts. They do not claim to be some unlisted entity resembling a corporation; they claim to be a "business trust." The Code separately lists a

"trust" as a type of "entity," 11 U.S.C. § 101(15), but not as a "person," *id.* § 101(41), confirming that Congress deliberately admitted only the business subset of trusts to bankruptcy. *See Dille Fam. Trust*, 598 B.R. at 190.

The Trusts also protest that had Mr. Atiyeh used limited liability companies, eligibility would be beyond doubt. Opening Br. at 34. That is precisely the point. Mr. Atiyeh chose the trust form—and with it a spendthrift clause shielding the beneficial interests from creditors and a succession plan for his wife and descendants. In addition, it allowed him to pursue an exemption from realty transfer tax available only to a trust "other than a business trust," 72 Pa. Stat. § 8101-C, by insisting for years that the Trusts are ***not*** business trusts. Having taken advantage of that choice for nearly two decades, the Trusts cannot now disclaim its consequences.

This Court, like the Bankruptcy Court, should consider these other factors indicative of business trusts when determining whether the Trusts are business trusts. This Court should not focus solely on the Trusts' purpose, as the Trusts propose (though, even if it did, that would not change the result). When the Court considers these other relevant and necessary factors, it will become further apparent that the Trusts are not business trusts.

### D. The Trusts Fail Under Any Definition of Business Trust

To determine whether the Trusts are business trusts, this Court therefore should apply a definition of "business trust" that takes into account the indicia of business trusts which are repeatedly considered by various courts in determining whether a trust is a business trust. These factors provide critical further support in determining whether a trust was actually formed for a business purpose. In this matter, none of these factors supports the conclusion that the Trusts are business trusts. Notably, the Trusts do not challenge the Bankruptcy Court's findings that the beneficial interests in the Trusts are not transferable and that the Trusts will not exist in perpetuity. *See* Opening Br. at 5-6, 41. As a result, under any test courts have applied to identify "business trusts," the Trusts fail.

#### 1. The factors considered by the Bankruptcy Court

As the Bankruptcy Court found, the Trusts do not have what are arguably "the most important attributes of a business trust"—existence under state law, transferable beneficial interests, perpetual existence, formation by a group of investors, and creation and maintenance for a business purpose. App. 22. The Trusts do not have the last attribute, as explained above. As set forth below, a review of the other four characteristics further shows that the Trusts are not business trusts.

**(a) The Trusts are not business trusts under Pennsylvania law**

To determine whether a trust is a business trust under Pennsylvania law, one must look to the General Association Act of 1988, Act No. 1988-177 (the "GAA"), in particular 15 Pa. C.S. § 9501 *et seq*., which codified "business trusts" under Pennsylvania law. *See* 15 Pa. C.S. § 9501(c). Under Pennsylvania law, per the GAA, a business trust is defined as "an association organized as a trust:

> (i) Whose deed of trust or other organic document has been filed in the department and is in effect under this chapter.
>
> (ii) Whose deed of trust or other organic document states, by amendment or otherwise, that the trust exists subject to the provisions of this chapter, in the case of a business trust heretofore established under the laws of this Commonwealth or heretofore or hereafter established under the laws of any other jurisdiction."

*Id.* at § 9501(a)(1).

Under the first requirement, the trustees of a business trust must file the organizing document with the Pennsylvania Department of State. *Id.* at § 9503(a). In their opening brief, the Trusts assert that "[w]hile the motion to dismiss was pending in the Bankruptcy Court, the Trusts applied for registration as Domestic Business Trusts with the Pennsylvania Department

of State, Bureau of Corporations and Charitable Organizations."[4] Opening Br. at 36 n. 15. Although the Trusts claim that they "received confirmation that the State had assigned Saucon Trust and Whitehall Trust … dedicated Domestic Business Trust identification numbers" in February 2026, the Trusts have offered no evidence to support these claims (other than merely asserting that these designations are "publicly verifiable").[5] *Id*. In any event, the Trusts' (which were formed in 2007) purported 2026 filings as Domestic Business Trusts is not a part of the record on this appeal and may not be considered. *See In re Von Kiel*, 486 B.R. 327, 330 (E.D. Pa. 2013) ("A district court's review of a bankruptcy appeal is limited to the record before the bankruptcy court."); *see also In re Madera*, 586 F.3d 228, 234 (3d Cir. 2009) (finding no error in the district court excluding from consideration evidence that "was not 'made a part of the appellate record by the bankruptcy court'"). Nor would a post-petition registration matter even if it were of record,

[4] The Trusts—which were formed in 2007—apparently did not think to register as business trusts for more than 15 years, until Lender's motion to dismiss challenged their qualification as business trusts and thus their eligibility to be debtors in the bankruptcy proceeding. *See* App. 298; App. 421.

[5] During the February 24, 2026 hearing before the Bankruptcy Court, the Trusts conceded "[t]hese [Trusts] are not registered with the State, we agree with that. That is something we've looked and we are correcting. We, actually, are in the process of registering them right now, and that registration is pending." App. 272-73.

because eligibility under Section 109 "is determined by facts as they exist at the time the bankruptcy petition is filed." App. 32 (quoting *Cath. Sch. Emps. Pension Tr.*, 599 B.R. at 652) (emphasis omitted).

Likewise, the Trusts unquestionably fail the second requirement—that the "deed of trust or other organic document states ... that the trust exists subject to the provisions of this chapter ..."—because the Trust Agreements make no reference to the GAA. 15 Pa. C.S. § 9501(a)(1)(ii); App. 298; App. 421. In response to this lack of express language in the Trust Agreements, and in an attempt to support their position that the Trusts are business trusts, the Trusts refer to the Pennsylvania Board of Finance and Revenue's conclusion that Whitehall Trust was structured as a business trust. *See* Opening Br. at 7. But, at the time of the Board's decision, Mr. Atiyeh and Whitehall Trust actually ***disagreed*** with the Board's characterization of Whitehall Trust as a business trust. *See* App. 184-85, at ¶¶ 9-13. Indeed, after "[t]he Board determined that Whitehall is a business trust required to pay taxes pursuant to the [Realty Transfer Tax] Act ... Whitehall ***appealed*** the Board's decision to the Commonwealth [Court] of Pennsylvania for judicial review."[6] App. 185, at ¶¶ 10-11 (emphasis added). Atiyeh then fought the

[6] Under the Realty Transfer Tax Act, "[u]ncompensated transfers to living or ordinary trusts are excludable from taxation[.]" App. 22 (citing 72 Pa. Stat. § 8102-C.3(8)-(8.1)); *see also* 72 Pa. Stat. § 8101-C (defining "living

Board's conclusion that Whitehall Trust was a business trust for years, before ultimately settling with the Board for a substantially reduced amount of transfer tax. *See id.* at ¶ 13.

Mr. Atiyeh and the Trusts cannot maintain ***for years*** that they are not business trusts (while seeking—for the most part successfully—to avoid paying transfer taxes on that basis) only to now reverse course and argue—now that qualifying as a business trust would benefit them—that they are business trusts and therefore eligible to be debtors under the Bankruptcy Code. Atiyeh's long-held prior position, including in litigation, with respect to Whitehall Trust being a Living Trust fatally undermines the Trusts' current argument that the Trusts were formed for the purpose of carrying out business. Is Mr. Atiyeh again arguing that his prior representations in his litigation with the Pennsylvania Board of Finance and Revenue were "a mistake," were "improper," and were "incorrect"?

This 180-degree flip in Mr. Atiyeh and the Trusts' position with respect to whether the Trusts are living or business trusts is another example of Mr. Atiyeh and the Trusts changing their tune when convenient. *See supra* Section V.G (describing the contradictory positions taken by the Trusts in the

---

trust" and "ordinary trust" in part as "[a]ny trust, other than a business trust …").

Foreclosure Actions and the bankruptcy proceedings as to the relationship between the Trusts and the Manor Debtors); *see also* App. at 24-25 ("[I]t is hard to ignore the fact that the Saucon property was deeded to a self-proclaimed 'LIVING TRUST.' For years Atiyeh insisted that the Whitehall property was, too. *Now that it suits him, he argues precisely the opposite*.") (emphasis added).

In sum, Mr. Atiyeh neither (1) registered the Trusts with the State ***nor*** (2) referred to the state statute in their trust agreements. Because Atiyeh did neither, the Trusts are not business trusts under Pennsylvania law. *See, e.g., Eagle Trust*, 1998 WL 635845, at *5 (concluding that a putative debtor was not a Pennsylvania business trust because it failed to register as such with the Department of State (citing 15 Pa. C.S. § 9503(a)); *N. Hills Vill.*, 479 F. Supp. 3d at 195 (determining that a real estate trust was not a Pennsylvania business trust because it failed to comply with the dictates of 15 Pa. C.S. § 9501(a)).

**(b) Beneficial interests in the Trusts are not transferable**

A review of the Trust Agreements demonstrates that beneficial interests in the Trusts are not transferable, because each of the Trust Agreements contains a spendthrift clause which ***prohibits*** transfers of beneficial interests. *See* App. 431, at ¶ 9; App. 306, at ¶ 7. Trusts which

contain spendthrift clauses have been held repeatedly not to qualify as business trusts, a fact that the Bankruptcy Court recognized in finding that the Trusts are not business trusts. *See* App. at 26; *see also Tiel Trust*, 656 B.R. at 846; *Two Rivers*, 653 B.R. at 290. "This fact weighs strongly in favor of dismissing the Trusts." App. at 26. The lone decision the Trusts cite in which a trust with a spendthrift provision qualified as a business trust, *Hammons*, 573 B.R. at 895 & n.6, involved a trust the "overwhelming body" of whose work "was to operate a massive business enterprise." *Id.* at 895. That is not the case with these Trusts.

**(c) The Trusts are not meant to exist in perpetuity**

A business trust is "secure from termination or interruption by the death of owners of beneficial interests." *Morrissey*, 296 U.S. at 359. Here, the Trust Agreements show why the Trusts fail to meet this factor. By the express terms of the Trust Agreements, the Trusts terminate at a certain point in the future. *See* App. 425, at ¶ 3.6 ("The Term of the Trust shall be fifty (50) years[.]"); App. 424, at ¶ 3.2.4.2.2.3 (providing for estate succession and intra-family distribution of the property to Mr. Atiyeh's wife and children upon his death); App. 300, at ¶ 2.2.4.2.2.3 (same). This weighs against finding that the trusts are business trusts. *See* App. 27 (concluding

based on this language that "it is safe to conclude that the Trusts are family trusts").

#### (d) The Trusts were not formed by a group of investors

Here, it is undisputed that "[t]he Trusts were not formed by a group of investors seeking returns on their investment." App. 27. Rather, the Trusts were formed by Mr. Atiyeh alone. "Atiyeh was the sole settlor and conveyor of assets into the Trusts. Yet he did not thereby invest in the Trusts or the assets conveyed into them. No meaningful placement or layout of capital occurred by virtue of the Trusts' formation. Then as now, Atiyeh owned both sides of the settlement sheets." *Id.*; App. 266 ("There is no group of investors. [Lender] is completely correct, there's only one, its Mr. Atiyeh.").

### 2. The Trusts fail to satisfy the other characteristics of business trusts courts have recognized

The preceding factors expressly considered by the Bankruptcy Court are often articulated as the requisite indicia of corporateness for a business trust. *See N. Hills Vill.*, 479 F. Supp. 3d at 197. The following factors—although not directly considered by the Bankruptcy Court—are additional characteristics of a business trust that other courts have considered and provide context for this Court to consider in evaluating whether the Trusts are business trusts. *See id.* at 198. These factors also consistently support the Bankruptcy Court's decision.

**(a) The Trusts do not implement a bargained-for-exchange**

As the Bankruptcy Court recognized, the Trusts cannot implement a bargained-for-exchange because Mr. Atiyeh is the only player involved. "Then as now, Atiyeh owned both sides of the settlement sheets. He effectively owned and controlled the Trusts—same as he owned, operated, and controlled the properties conveyed into them. Atiyeh also owned and operated the company charged with construction and maintenance of the properties." App. 27-28. Because the settlor, the donor, and the primary beneficiary are all Mr. Atiyeh, any bargain would be between Mr. Atiyeh and himself. Thus, there is simply no bargained-for exchange. *See* App. 28 ("[T]he complete concentration of ownership interests in Atiyeh forecloses the possibility of a bargained-for exchange.").

A "general distinction" between a traditional trust and a business trust is that "a business trust implements a bargained-for exchange." *GBForefront*, 888 F.3d at 40; *see also N. Hills Vill.*, 479 F. Supp. 3d at 196 (explaining that a court must determine whether the trust "implements a bargained-for exchange, as in a business trust, or a donative transfer, as in a traditional trust"). Because there is no bargained-for exchange here, this factor supports the Bankruptcy Court's finding that the Trusts are not business trusts.

**(b) Mr. Atiyeh transferred property to the Trusts without compensation**

It is undisputed that Mr. Atiyeh transferred the property to the Trusts without receiving compensation for the real estate. *See* Opening Br. at 5 ("He later contributed the parcels to the respective Trusts, which did not pay money for them."); App. 268-69. This factor supports the Bankruptcy Court's finding that the Trusts are not business trusts because this is a donative transfer, rather than a bargained-for-exchange for the property. *See GBForefront*, 888 F.3d at 40.

**(c) Mr. Atiyeh is not the sole beneficiary of the Trusts**

Although the Trusts argue that Mr. Atiyeh is the sole beneficiary, the originating Trust documents, including the deeds of trust, demonstrate that the Trusts' argument is false. Specifically, the deed transferring the Whitehall property to Whitehall Trust states, "This is a deed from a person to a Trust created by him in which the *only beneficiaries are the Grantor and his spouse and lineal descendants* …" App. 442 (emphasis added). Further, the Trust Agreements spell out that Mr. Atiyeh's wife will succeed Mr. Atiyeh as the primary beneficiary in the event Mr. Atiyeh predeceases her. App. 298, at ¶ 2.2.1; , App. 422, at ¶ 3.2.1. And, in the event Mr. Atiyeh and his wife predecease their children, the latter become the primary beneficiaries. App. 299-300, at ¶ 2.2.4-2.2.4.4; App. 423-25, at ¶ 3.2.4-

3.2.4.5. Because the Trust documents contemplate beneficiaries in addition to Mr. Atiyeh, this factor supports the finding that the Trusts are not business trusts.

**(d) A business trust's res consists of property originally contributed by the beneficiaries**

The Trusts' argument that they are business trusts because Mr. Atiyeh—as the purported sole beneficiary—contributed the Trusts' res by deeding the real property to the Trusts, is an incomplete and improper argument. While Mr. Atiyeh was the sole contributor of property into the Trusts, the other beneficiaries—Mr. Atiyeh's wife and children—contributed no assets or property to the Trusts. Because no other beneficiaries contributed property to the Trusts, this factor weighs against finding that the Trusts are business trusts.

**(e) Some business trusts vest title to the trust property in the trust, rather than in the trustees**

As to Whitehall Trust,[7] the Trusts conceded in the bankruptcy proceedings that Whitehall Trust is akin to a traditional trust in that the deed transfers the real property to the trustee rather than to Whitehall Trust. *See*

[7] As to Saucon Trust, the deed transfers the real property from Mr. Atiyeh to Saucon Trust. App. 292. This, however, is not dispositive because the factor provides that only "[s]ome business trusts vest title to the trust property in the trust as a legal entity, rather than in the trustees[.]" *N. Hills Vill.*, 479 F. Supp. 3d at 198; *RBx Cap.*, 2023 WL 3324682, at *3.

App. 270 ("Whitehall, the deed is to the trustee for the trust."); App. 444 (deeding the property from Mr. Atiyeh to "WHITEHALL FIDUCIARY, LLC, as Trustee of WHITEHALL TRUST"). Accordingly, at least as to Whitehall Trust, this factor weighs in favor of affirming the Bankruptcy Court's finding that the Trusts are not business trusts.

#### (f) The Trusts concede that they do not refer to Mr. Atiyeh as a shareholder or member

The Trusts further conceded in the bankruptcy proceedings that they do not meet this factor because the Trusts do not refer to Mr. Atiyeh as a shareholder or member, as beneficiaries of business trusts are typically referred to. *See* App. 270 ("We don't meet that test. We refer to the beneficiary as 'Abe.' He's -- he is the sole beneficiary, he's the settlor. We don't refer to him as a 'member' or a 'shareholder.'"); *N. Hills Vill.*, 479 F. Supp. 3d at 198. Accordingly, this factor weighs in favor of affirming the Bankruptcy Court's finding that the Trusts are not business trusts.

#### (g) Members of a business trust can have the ability to elect, remove, or control the various trustees and amend the terms of the trust

Although Mr. Atiyeh has the power to amend the terms of the Trusts, the context of that power is that he is the settlor of the Trusts, who ordinarily possesses such a power. He is not a "member" of the trusts and thus is not a "member" who has the power "to elect, remove, or control the various

trustees." *N. Hills Vill.*, 479 F. Supp. 3d at 198. Accordingly, as the Trusts are more akin to traditional trusts than business trusts in this sense, this factor weighs against reversing the Bankruptcy Court's order.

**(h) Mr. Atiyeh, as the settlor, does not retain a residual interest in the trust *res***

The Trust Agreements make clear that Mr. Atiyeh does not retain a residual interest in the Trusts' res. *See* App. 298; App. 421. The Trust Agreements provide that, upon the death of Mr. Atiyeh, his wife, and his children, "the assets of such trust or trusts shall be distributed in accordance with the provisions of the Grantor's Last Will and Testament [or Trust] as though such trust assets were a part to the Grantor's estate." App. 300-01, at ¶ 2.2.4.5; App. 425, at ¶ 3.2.4.5. Mr. Atiyeh does not retain an interest in the res of either Trust. Mr. Atiyeh will never retake possession of the res nor will it become a part of his estate. Accordingly, this factor weighs in favor of affirming the Bankruptcy Court's finding that the Trusts are not business trusts.

* * *

A review of the above factors demonstrates that the Bankruptcy Court's finding that the Trusts failed to meet their burden of proving that they are business trusts is fully supported by the record. Under any test courts have formulated—with any combination of these factors—the Trusts

overwhelmingly lack the indicia that would demonstrate they are business trusts. Accordingly, this Court should affirm the Bankruptcy Court's finding that Trusts are not business trusts.

## VIII. CONCLUSION

For the foregoing reasons, this Court should affirm the Bankruptcy Court's dismissal of the Trusts' bankruptcy cases because the Trusts are not business trusts and, thus, are ineligible to be debtors under Section 109 of the Bankruptcy Code.

Respectfully submitted,

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Dated: September 25, 2026

By: *<u>/s/ Matthew A. Hamermesh</u>*
Matthew A. Hamermesh
Sara E. Smith
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
mhamermesh@hangley.com
ssmith@hangley.com

*-and-*

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3,
Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

*Attorneys for Secured Creditor*
*Lehigh Valley 1, LLC*

## CERTIFICATE OF COMPLIANCE

I, Matthew A. Hamermesh, hereby certify on September 25, 2026, pursuant to Federal Rule of Bankruptcy Procedure 8015(h), that the foregoing Appellee Lehigh Valley 1, LLC's Brief contains 12,952 words.

*/s/ Matthew A. Hamermesh*
Matthew A. Hamermesh

## CERTIFICATE OF SERVICE

I, Matthew A. Hamermesh, hereby certify that on September 25, 2026, I caused the foregoing Appellee Lehigh Valley 1, LLC's Brief to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

*/s/ Matthew A. Hamermesh*
Matthew A. Hamermesh